**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 19-cv-00861-RM-MEH

GOOD FUNDS LENDING, LLC,

       Petitioner,

v.

WESTCOR LAND TITLE INSURANCE COMPANY,

       Respondent.

---

**ORDER**

---

This matter is before the Court on Respondent Westcor Land Title Insurance Company's ("Westcor") "Motion for Judgment on the Pleadings and, if applicable, for Entry of an Order of Satisfaction" (ECF No. 14) (the "Motion"). For the reasons set forth below, the Court grants the Motion in part and denies the Motion in part.

## I.    BACKGROUND

On March 22, 2019 Good Funds Lending, LLC ("GFL") filed its Amended Petition to Confirm Arbitration Award for Entry of Judgment (the "Amended Petition"). (ECF No. 3.) The Amended Petition is related to an arbitration between Westcor and GFL which was conducted as a result of a title insurance coverage claim handling dispute. (ECF No. 14, ¶¶ 2–6.) GFL, which is a commercial loan provider, loaned $220,700 to C3 Investments LLC ("C3"), and the loan was insured by Westcor ("Title Policy"). (ECF No. 14, ¶ 2.) C3 defaulted on the loan and despite selling the property securing the loan, GFL was left with a deficiency of $198,350.19. (ECF No. 14, ¶ 3.) Prior to the foreclosure sale, GFL filed a claim on the Title Policy and spent $1,820.25

on a survey related to the claim. (ECF No. 14, ¶ 4.)

GFL objected to how Westcor handled the claim and initiated a claim with the National Arbitration Forum around June 29, 2017. (ECF No. ¶ 5.) After a five-day evidentiary hearing, the Arbitrator issued his Final Award on December 20, 2018. (ECF No. 14, ¶ 7.) The Arbitrator found in favor of GFL on its (1) breach of Title Policy and (2) breach of the covenant of good faith and fair dealing claims. (*Id.*) Consequently, the Arbitrator awarded GFL the amount of its deficiency ($198,350.19) plus the cost of the survey ($1,820.25) for a total award of $200,170.44, plus 8% statutory interest compounded annually to run from February 10, 2016 until paid. (*Id.*) However, the Arbitrator found GFL's claims of bad faith, breach of closing instructions, breach of fiduciary duty, and exemplary damages lacked substantial justification and awarded Westcor $70,129.38 (consisting of $48,726 in attorney fees and $21,403.38 in costs). (*Id.*)

On January 9, 2019, GFL filed a Request and Motion for Modification to Clarify Interest Rate on Compensatory Damages Award to GFL Pursuant to C.R.S. Section 13-22-220(1)(c) ("Clarification Motion"). (ECF No. 14, ¶ 8.) Notably, the Clarification Motion asked the Arbitrator to adjust the interest portion of the Final Award to reflect a 25% default interest rate, compounded daily. (ECF No. 14, ¶ 8.) The Arbitrator found GFL's Clarification Motion was disingenuous and lacked substantial justification, and instead of amending the Final Award, the Arbitrator issued a separate order directing GFL to pay Westcor's attorney fees ($1,000) and additional arbitrator fees ($750) incurred in responding to the Clarification Motion ("Sanction Order").[1] (*Id.*)

On February 8, 2019, Westcor delivered to GFL's counsel a letter and check payable to

---

[1] The parties do not address this portion of the Sanction Order in their briefing aside from noting that it was part of the Sanction Order. Therefore, the Court does not consider it as part of the controversy before it.

GFL in the amount of $181,083.00. (ECF Nos. 12-5; 14, ¶ 10.) Westcor calculated the amount

based on the following table, which was contained within a Notice of Tender separate from the

letter delivered earlier that day but also served on counsel for GFL on February 8, 2019. (ECF

No. 12-5, at 8.)

### Amount Owed Calculation

| | | |
|---|---|---:|
| **Award to Good Funds** | | |
| Debt | $ | 198,350.19 |
| Survey | $ | 1,820.25 |
| Total | $ | 200,170.44 |
| | | |
| Interest | | |
| Rate: 8%, compounded annually | | |
| Year 1 (Feb. 10, 2016-Feb. 10, 2017) | $ | 16,013.64 |
| Subtotal | $ | 216,184.08 |
| Year 2 (Feb. 10, 2017-Feb. 10, 2018) | $ | 17,294.73 |
| Subtotal | $ | 233,478.80 |
| Year 3 (Feb. 10, 2018-Feb. 10, 2019) | $ | 18,678.30 |
| Subtotal | $ | 252,157.11 |
| One day interest [(.08/365)*$252,157.11] | $ | 55.27 |
| Total due Good Funds as of Feb. 11, 2019 | $ | 252,212.37 |
| | | |
| **Award to Westcor** | | |
| Fees | $ | 48,726.00 |
| Costs | $ | 21,403.38 |
| Fees on Motion | $ | 1,000.00 |
| Total due Westcor | $ | 71,129.38 |
| | | |
| **Net payment due Good Funds** | **$** | **181,082.99** |

According to Westcor's calculations, $181,083.00 was the difference between what GFL was

entitled to as of February 11, 2019 minus the award to Westcor *and* the Sanction Order, rounded

to the nearest dollar. (*Id.*)

On March 12, 2019, GFL filed the Amended Petition, which sought to confirm the Final

Award and did not reference the Clarification Motion or Sanction Order. (ECF No. 3.) However,

in its Answer to the Amended Petition ("Answer"), Westcor attached a copy of the Clarification

Motion, its Response to the Clarification Motion, and the Sanction Order. (ECF No. 12, ¶ 17.)

Westcor's Motion seeks one of three alternatives. First, Westcor seeks an order dismissing the Amended Petition as moot because Westcor has already satisfied the Final Award through its payment on February 8, 2019. (ECF No. 14, at 7–9.) Alternatively, if the Amended Petition is not moot, then Westcor requests the Court to enter judgment confirming the Final Award, in its entirety, including the additional $1,000 in attorneys' fees awarded to Westcor as a result of GFL's Clarification Motion, and enter an order of satisfaction. (ECF No. 14, at 10–11.) If the Court confirms the Final Award but cannot determine satisfaction, then Westcor argues post-judgment interest should accrue at a rate in accordance with 28 U.S.C. § 1961. (ECF No. 14, at 13–14.) Finally, Westcor argues that each party should bear their own attorneys' fees and costs. (ECF No. 14, at 11–13.)

## II. LEGAL STANDARD

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is reviewed under the same standard applicable to a motion under Rule 12(b)(6). *Landmark American Ins. Co. v. VO Remarketing Corp.*, 619 Fed. App'x 705, 708 (10th Cir. 2015) (citing *Aspenwood Inv. Co. v. Marinez*, 355 F.3d 1256, 1259 (10th Cir. 2004)). "A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6)." *Zevallos v. Allstate Property and Casualty Co.*, 776 Fed. App'x 559, 561 n.1 (10th Cir. 2019) (citing *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2009)). The courts examine whether the complaint's allegations are "enough that, is assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1224 (10th Cir. 2009); *see id.* at 1223.[2] The Tenth Circuit, however,

---

[2] The Court recognizes there is a circuit split regarding the scope of what may be considered for a Rule 12(c) motion. However, this Court will follow the rules of its reviewing court.

recognizes circumstances under which a court when ruling on a Rule 12(b) or 12(c) motion may consider documents or facts outside the complaint. *See Zevallos*, 776 Fed. App'x at 561 n.1 (citing *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (collecting cases)).

The Court "accepts all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same." *Colony Ins. Co. v Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012). A motion for a judgment on the pleadings "only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court." *Tuttle*, 2019 WL 2208513, at *2 (quoting 5C Charles Alan Wright et al., Federal Practice & Procedure § 1367 (3d ed., Apr. 2019 update)). In other words, to prevail on a motion for judgment on the pleadings, the movant must establish an absence of any issue of material fact and entitlement to judgment as a matter of law. *Colony*, 698 F.3d at 1228.

## III.  ANALYSIS

### A.  Mootness

Westcor first contends this matter is moot because it made full payment on the Final Award on February 8, 2019 – with interest calculated until February 11, 2019 – more than a month before GFL initiated this action. (ECF No. 14, at 7.) As a result, Westcor contends "[t]here is nothing left to fight about." (*Id.*)

This district has addressed this identical issue on at least two occasions, and the Court is persuaded by the rationale in these cases. In *Gorsuch, Ltd. v. Wells Fargo Nat'l Bank Ass'n*, the court held a confirmation action is a "summary proceeding separate and distinct from an action to enforce the award." No. 11-cv-00970-PAB-MEH, 2013 WL 4494304, at *2 (D. Colo. Aug. 21, 2013). *See also Will v. Parsons Evergreene, LLC*, No. 08-cv-00898-DME-CBS, 2011 WL

2792398, at *1 (D. Colo. July 15, 2011) (confirmation of the award did not implicate the question of compliance and absent grounds for modification, correction, or vacatur, court had to confirm arbitration award "even though Parsons does not dispute the award and has complied with it."); *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007) ("A district court confirming an arbitration award does little more than give the award the force of a court order. At the confirmation stage, the court is not required to consider the subsequent question of compliance."). The *Gorsuch* court determined the plain language of the Federal Arbitration Act ("FAA") did not allow a court to deny a petition to confirm an award simply because it had arguably been satisfied. *Gorsuch*, 2013 WL 4494304, at *2.

The *Gorsuch* court rejected the same two cases on which Westcor relies for its argument here: *Local 2414 of United Mine Workers of America v. Consolidation Coal Co.*, 682 F. Supp. 399 (S.D. Ill. 1988) and *Derwin v. General Dynamics Corp.*, 719 F.2d 484 (1st Cir. 1983). *Gorsuch*, 2013 WL 4494304, at *2. While the *Gorsuch* court rejected *Local 2414* and *Derwin* on the basis that "[c]oncerns pertaining to dispute resolution in the context of organized labor are not relevant to the matter at hand," (*Gorsuch*, 2013 WL 4494304, at *2) this Court does not make such a pronouncement. Instead, the Court finds neither *Local 2414* nor *Derwin* dealt with the specific issue of whether purported satisfaction moots the dispute prior to initiating an action to confirm the award. Consequently, the Court finds *Local 2414* and *Derwin* inapplicable.

This Court is persuaded, however, by the rationale that section 9 of the FAA is clear in what it requires of a district court of competent jurisdiction, and that it does not allow the Court, under these circumstances, to decline to confirm the Final Award. The Court concludes this action is not moot and denies the portion of Westcor's Motion that seeks dismissal of the Amended Petition with prejudice on the grounds that there is no case or controversy under

Article III as a result of its purported satisfaction of both the Final Award and the Sanction Order.

**B. The Court Confirms the Final Award and Finds Westcor Has Satisfied the Same.**

Westcor argues that even if this action is not moot, the Court should simultaneously confirm the Final Award *and* issue an order of satisfaction. (ECF No. 14, at 10–11.) GFL argues that the Court should deny Westcor's Motion in its entirety and not rule on satisfaction, but does not provide any indication as to what this Court is supposed to wait for to make an ultimate determination as to the Amended Petition. (ECF No. 22, at 14.) Instead, the Court agrees with Westcor.

*1. Confirmation*

Section 9 of the FAA sets out the elements that must be present for a district court to confirm an arbitral award: (1) the parties must have agreed to binding arbitration; (2) the petition to confirm the award must be brought within one year of the award; (3) notice of the petition must be served on the adverse party; and (4) the petition must be brought in an appropriate court. *Morgan Stanley Smith Barney LLC v. Monaco*, No. 14-cv-00275-RM-MJW, 2014 WL 5353628, at *1 (D. Colo. Aug. 26, 2014) (citing 9 U.S.C. § 9). Confirmation of an arbitral award under section 9 of the FAA is intended to be summary. *See id.*; *Hungry Horse LLC v. E Light Elec. Servs., Inc.*, 569 Fed. App'x 566, 569 (10th Cir. 2014) (recognizing the goal of arbitration is the "speedy and final resolution of disputes").

a. <u>Final Award</u>

Neither party disputes the confirmation of the Final Award nor any of the elements necessary under 9 U.S.C § 9. Therefore, this Court confirms the Arbitrator's Final Award executed on December 20, 2018. *See* 9 U.S.C. § 9 ("[A]t any time within one year after the

award is made any party to the arbitration may apply to the court so specified for an order

confirming the award, and thereupon the court must grant such an order unless the award is

vacated, modified, or corrected[.]").

b. Sanction Order

Westcor also moves to confirm the Sanction Order that was issued on January 15, 2019

as part and parcel with the Final Award. (ECF No. 14, at 10–11.) GFL opposes this position on

the grounds that Westcor's Motion goes beyond the pleadings. (ECF No. 22, at 12–15.)

GFL makes three arguments as to why the $1,000 is not properly before the Court on

consideration of either confirmation or satisfaction – which is discussed in more detail below.

First, GFL argues the Arbitrator did not have the authority to award sanctions as a result of the

Clarification Motion. Second, it argues the Sanction Order was not addressed in the Amended

Petition, because GFL still had time to challenge the Sanction Order under section 12 of the FAA

in that the Amended Petition was filed prior to the expiration of the three-month challenge period

allowed by 9 U.S.C. § 12. (ECF No. 22, at 13 n.8.) Finally, GFL argues the Sanction Order is not

properly before the Court because Westcor's Answer to the Amended Petition is not a "legally

cognizable response[] to GFL's Petition, which is to be treated as a motion and not a

pleading . . ." (ECF No. 22, at 13–14.)

First, regardless of whether the Arbitrator had the authority to issue sanctions on GFL's

Clarification Motion, this challenge is untimely; the first time GFL even hinted at this argument

was in its response to Westcor's Motion on May 15, 2019, which is beyond the time period

allowed under section 12 of the FAA to challenge the validity of the award before the Arbitrator.

Therefore, unless Westcor had received notice of a motion to vacate or modify the Sanction

Order at the time it filed its Motion, the Sanction Order could not be challenged. Therefore, the

Court will not entertain this argument to the extent GFL insinuates it *could* challenge the sanction.

Moreover, GFL does not make any argument here that the Arbitrator, for example, exceeded his authority in awarding Westcor $1,000 in attorney's fees under C.R.S. § 13-17-102. *See* 9 U.S.C. §§ 10(a)(4), 11; *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 587 (2008) ("On application for an order confirming the arbitration award, the court 'must grant' the order 'unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.' There is nothing malleable about 'must grant,' which unequivocally tells courts to grant confirmation in all cases, except when one of the 'prescribed' exceptions applies."). Instead, GFL argues that the Sanction Order was not made part of the Final Award because the Arbitrator's ability to change a Final Award is limited under C.R.S. § 13-22-215(1)(a) and (c). *See Applehans v. Farmers Ins. Exchange*, 68 P.3d 594, 596–97 (Colo. App. 2003). As a result of not being made part of the Final Award through a modification under C.R.S. § 13-22-211, GFL argues the Court should not consider the Sanction Order. Such arguments, however, are insufficient. For example, the fact that GFL filed its Clarification Motion[3] indicates that at least GFL agreed that the Arbitrator had the authority to modify the Final Award to a significant degree. Now before this Court, GFL insinuates the Sanction Order, to the degree it could be considered a modification or clarification of the Final Award is outside the bounds of the Arbitrator's authority – the authority it sought the Arbitrator to exercise by greatly increasing the interest rate. *See* (ECF No. 3-4, at 34); C.R.S. § 13-17-102. This is argument is disingenuous at best and is rejected.

---

[3] The Court finds it may take judicial notice of the arbitration proceedings, including the filings. *See Asphalt Trader Ltd. v. Beal*, No. 1:17-cv-00015-HCN, 2019 WL 4932748, at *2 (D. Utah Oct. 7, 2019) (collecting cases). It is undisputed that GFL filed the Clarification Motion with the Arbitrator, and that it says what it says. (ECF No. 12-4.)

Furthermore, to the extent that parties discuss *Applehans*, this Court's determination is not inconsistent with it. The *Applehans* court held the arbitrator's modification of the final award "dramatically changed the amount of plaintiff's recovery; thus it affected the merits of the controversy." 68 P.3d at 598. In its reasoning, it also determined the plaintiff did not agree that the award could have been modified. *Id.* at 597–98 (collecting cases). Here, even though GFL argues the Sanction Award was not a modification, it sought to modify the Final Award. Specifically, GFL's requested relief is that "the Award should be modified to read as follows . . ." (ECF No. 12-2, at 4.) To say the Arbitrator had the authority to modify the Final Award when it benefitted GFL but not if it harmed GFL is duplicitous. Additionally, the Sanction Order cannot have dramatically changed the amount to which GFL was entitled. *See Applehans*, 68 P.3d at 596 (arbitrator decreased award from $95,000 plus interest and costs to $25,000 plus interest and cost). Therefore, this Court's conclusion is consistent with *Applehans*.

GFL's also argues the Sanction Order is not "properly before this Court in the summary proceeding regarding the Final Award," because: (1) confirmation proceedings are intended to be summary in nature, implying that including the Sanction Order would bog down this proceeding; and (2) the Court should not recognize Westcor's pleadings. (ECF No. 22, at 13 n.8.) GFL provides no authority for its position beside citing the FAA and arguing "the specific procedural requirements of Sections 9 and 13 of the FAA for seeking confirmation of an award have not been satisfied with respect to it." (ECF No. 22, at 13.) GFL fails to identify which, if any, procedural requirements are missing from Westcor's request for this Court to consider the $1,000 sanction award.

As to GFL's first argument, the Court is not persuaded that it should ignore an award that is now ripe and would otherwise require the parties engage in yet another confirmation or

compliance proceeding over $1,000.[4] Indeed, these proceedings are intended to be summary in nature, and the goal of arbitration in the first place is the "speedy and final resolution of disputes." *See Hungry Horse*, 569 Fed. App'x at 569. It strains credulity to argue the Court should not consider a ripe award, and the satisfaction thereof, when doing so would be antithetical to the nature and intent of arbitration proceedings.

GFL's second argument fares no better. Its premise is that a petition to confirm an arbitration award is less of a pleading and more akin to a motion to which no response is necessary or even recognized by law. (ECF No. 22, at 13–14.) GFL provides no authority for its dubious interpretation, and the Court rejects this argument.

In the Tenth Circuit "[a] motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6)." *Zevallos v. Allstate Property and Casualty Co.*, 776 Fed. App'x 559, 561 n.1 (10th Cir. 2019) (citing *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2009)). The courts examine whether the complaint's allegations are "enough that, is assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1224 (10th Cir. 2009); *see id.* at 1223.[5] The Tenth Circuit, however, recognizes circumstances under which a court when ruling on a Rule 12(b) or 12(c) motion may consider documents or facts outside the complaint. *See Zevallos*, 776 Fed. App'x at 561 n.1 (citing *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (collecting cases)). Importantly, one of the exceptions provided in *Gee* is that a court may consider "matters of which a court may take judicial notice." *Gee*, 627 F.3d at 1186 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

---

[4] Albeit, a payment $1,000 short in February 2019 would result in a significant increase to GFL at the time this Order is entered. *See infra* n.3.

[5] The Court recognizes there is a circuit split regarding the scope of what may be considered for a Rule 12(c) motion. However, this Court will follow the rules of its reviewing court until determined otherwise.

The Court may take judicial of the Sanction Order. *See Consolidation Coal Co. v. United Mine Workers of America, Dist. 12, Local Union 1545*, 213 F.3d 404, 407 (7th Cir. 2000) (arbitrator decisions are "arbitral equivalent of a judicial decision, of which, of course, a court can take judicial notice"); *see also* Fed. R. Evid. 201(b).[6] The Court does so here. Consequently, the Court recognizes that even though the Arbitrator did not explicitly state the Sanction Order was to be considered a modification of the Final Award, the Sanction Order is part and parcel of the Final Award given it arose out of both the Final Award and GFL's attempt to alter the Final Award.

Therefore, where the Court has determined it may take judicial notice of the Sanction Order, it was within the Arbitrator's authority to issue such an order, and it is in the spirit of the FAA to consider the Sanction Order together with the Final Award, the Court confirms the Sanction Order as part and parcel of the Final Award.

### 2. Satisfaction

Included in Westcor's alternative arguments is that if the Court determines the Amended Petition is not moot, and if the Court confirms the Final Award and Sanction Order, then the Court should also enter an order of satisfaction. (ECF No. 14, at 10–11.)

Consequently, as the both awards have been confirmed, the only remaining dispute is whether Westcor's payment of $181,083 on February 8, 2019, which included offsets as stated above, fully satisfied the arbitration award. An offset for the sanction against GFL in the form of $1,000 in attorney's fees entered on January 15, 2019, was full satisfaction of the arbitration.

---

[6] In a lengthy footnote, GFL argues that "[i]f the Court determines [the Sanction Order] is properly before it," GFL should be given a second bite at the apple to address the issue. (ECF No. 22, at 13 n.8.) However, Westcor raised the issue in its Motion, and GFL had the opportunity to respond during briefing. "Issues addressed in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Mid-South Iron Workers Welfare Plan v. Harmon*, 645 Fed. App'x 661, 664 (10th Cir. 2016) (quoting *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1122 (10th Cir. 2004)); *Cole v. New Mexico*, 58 Fed. App'x 825, 829 (10th Cir. 2003) (failure to raise the issue in response to motion to dismiss waives the argument).

Under these facts and circumstances, the Court finds no just reason to delay determining whether Westcor satisfied full and final payment under the Final Award, taking into account the amounts ultimately awarded to Westcor, including the $1,000 sanction award (i.e., whether the February 8, 2019 payment was short $1,000).

GFL doesn't dedicate any time to Westcor's satisfaction argument. Instead, GFL seeks only confirmation of the Final Award in the amount of $200,170.44, and ignores all the amounts payable to Westcor. (ECF No. 22, at 14.) The Court rejects engaging in such a piecemeal evaluation of the arbitrated issues.[7]

Given the fact that the $1,000 Sanction Order is now final, and the Court finds both the Arbitrator's Final Award and Sanction Order should be confirmed, the Court concludes that Westcor's payment of $181,083 on February 8, 2019 is in full and final satisfaction of the arbitrated dispute.

## C. Each Party Shall Bear Its Attorneys' Fees & Costs

### 1. Attorneys' Fees

An award of attorney's fees incurred in obtaining enforcement of an arbitration award is discretionary. *Amicorp Inc. v. General Steel Domestic Sales, LLC*, No. 09-cv-01105-LTB-BNB, 2007 WL 2890089, at *6 (D. Colo. Sept. 27, 2007) (citing *United Steelworkers of Am. v. Ideal*

---

[7] For example, had Westcor not made payment on February 8, 2019 and instead waited until the time for GFL to challenge the $1,000 sanction, Westcor would have incurred at least an additional month's worth of interest. Additionally, if the Court were to confirm the Final Award in the amount of $200,170.44 accruing at 8% annual compounding interest, no doubt GFL would argue that the missing $1,000 means that the amount to which it was entitled was not paid on February 8, 2019 as Westcor argues. This means the clock would not have stopped on February 8, 2019 and interest would have continued to accrue up to the moment of full satisfaction, which as GFL would argue has not yet occurred. In other words, had Westcor paid $182,083, instead of $181,083, and waited for the Sanction Order to be final, GFL would have been required to pay Westcor that $1,000 later on. This is illogical and overly cumbersome. However, if the Court were to adopt this rationale, the $1,000 short – that GFL would eventually have to pay back anyway – would result in an additional $23,042.05 (the difference between $181,083 and $204,125.05 ($275,254.43 – 71,129.38). $275,125.05 is the amount had the 8% interest accrued until March 30, 2020) to GFL.

*Cement Co.*, 762 F.2d 837, 843 (10th Cir. 1985) ("[i]n an action to enforce an arbitration award, the allowance of attorney's fees is discretionary.")). A successful party may move for attorneys' fees "when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Fabricut, Inc. v. Tulsa General Drivers, Warehousemen and Helpers, Local 523*, 597 F.2d 227, 230 (10th Cir. 1979). Here, GFL pleads a form of relief of attorneys' fees, but does not cite under what authority it is entitled to attorneys' fees. (ECF No. 3, at 8.) In fact, the Arbitrator previously determined that the relevant "Title Policy, insurance contract, does not provide a basis for an award of attorney's fees and the statutory tort of bad faith is rendered inapplicable by its own terms with respect to title insurance companies, thus eliminating a statutory basis for an award of fees." (ECF No. 3-1, at 35 n.8.) *See also* C.R.S. § 10-3-1115(6); *Stewart Title Guaranty Co. v. Tilden*, 181 P.3d 94, 99 at n.2 (Wy. 2008) (attorney's fees cannot be obtained where those fees are based upon equitable policies rather than the insurance contract); *Guaranty Trust Life v. Estate of Casper*, 418 P.3d 1163, 1172 (Colo. 2018) (attorney's fees not actual damages in the absence of contractual or statutory mandates to the contrary because they are not "the legitimate consequences of the tort or breach of contract sued upon and thus not recoverable").

Additionally, this district has declined to award attorneys' fees in closer cases than this one. *See Amicorp*, 2007 WL 2890089, at *6 ("Although I have found that General Steel's attempt to vacate the arbitration award is without merit, I decline to award Amicorp its attorneys fees in this matter."); *Huitt v. Wilbanks Sec., Inc.*, 2017 WL 4697502, at *7 (D. Colo. Oct. 19, 2017) (Court denies attorneys' fees where plaintiff asks for fees but does not cite to any statutory or contractual provision authorizing such a request). GFL does not provide any basis for this Court to determine otherwise because GFL fails to respond to this argument in its Response to Westcor's Motion. Therefore, the Court declines to award GFL attorneys' fees.

### 2. Costs

Rule 54 provides that a prevailing party will normally recover costs. *See Cantrell v. Int'l Brother. of Elec. Workers, AFL-CIO, Local 2021*, 69 F.3d 456, 457 (10th Cir. 1995). However, the Tenth Circuit has held that it is within a District Court's discretion to refuse to award costs where a party was only partially successful. *See Cantrell*, 69 F.3d at 459. Here, it is clear that both parties win-in-part and lose-in-part in relation to their respective positions. Therefore, the Court declines to award costs to either party.

## IV. CONCLUSION

Based on the foregoing, it is ORDERED

(1)     That Westcor Land Title Insurance Company's Motion for Judgment on the Pleadings and, if Applicable, for Entry of an Order of Satisfaction (ECF No. 14) is GRANTED in part and DENIED in part;

(2)     That the Final Award of the Arbitrator, executed on December 20, 2018, and attached hereto as Exhibit A, is CONFIRMED:

> a.  $200,170.44 plus statutory interest, compounded annually to run from February 10, 2016 until paid, in compensatory damages in favor of Good Funds Lending, LLC and against Westcor;
>
> b.  $48,726 in attorney's fees in favor of Westcor and against GFL; and
>
> c.  $21,403.38 in costs in favor of Westcor and against GFL.

(3)     That the Sanction Order, executed on January 15, 2019, and attached hereto as Exhibit B, is CONFIRMED:

> a.  $1,000 in attorneys' fees in favor of Westcor and against GFL; and
>
> b.  $750 in additional arbitration fees to be paid by GFL through the FORUM.

(4)     That, in compliance with 9 U.S.C. § 13, Petitioner GFL shall file, to the extent not already filed with the Court, the following papers with the Clerk of Court, within 14 days of the date of this Order, on or before Monday, April 13, 2020:

      a.  The Sanction Order; and

      b.  Each notice, affidavit, or other paper used upon an application to confirm, modify, or correct the Final Award, including the briefing related to GFL's Clarification Motion, and a copy of each order of the court upon such an application;

(5)     That the Clerk shall enter judgment in favor of Petitioner as stated herein and against Respondent;

(6)     That Westcor has complied with and satisfied the Arbitrator's Final Award and the Arbitrator's January 15, 2019 Order;

(7)     That this Order shall also constitute a Satisfaction of Judgment and the Clerk shall so note in the docket entry;

(8)      That each party shall bear its own attorneys' fees and costs; and

(9)     That the Clerk shall close the case.

DATED this 30th day of March, 2020.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge

**Exhibit A**

## FORUM ARBITRATION DISPUTE RESOLUTION

### File No. FA1706001737926

| | |
|---|---|
| **CLAIMANT:** | GOOD FUNDS LENDING, LLC,<br>a Colorado limited liability company, |
| **v.** | |
| **RESPONDENT:** | WESTCOR LAND TITLE INSURANCE COMPANY,<br>a California corporation. |

## FINAL AWARD OF THE ARBITRATOR

This is the Final Award in the above-captioned matter which was heard and determined pursuant to the Initial Claim of Good Funds Lending, LLC, a Colorado limited liability company ("GFL"), in which it asserts various claims against Respondent, Westcor Land Title Insurance Company, a California corporation ("Westcor"), relating to or arising from Westcor's alleged breach of its obligation to GFL arising from a certain lender's title insurance Policy No. LP-13-3298733, dated on or about November 27, 2013 ("Title Policy"), and associated transactions. Westcor denies liability and asserts various defenses. The matter was tried to the Arbitrator in a Participatory Hearing from June 18-22, 2018 pursuant to the arbitration provision and agreement of the parties contained in the Title Policy which is the subject of this action. The Arbitrator has jurisdiction to hear and determine this dispute.

### SUMMARY

For the reasons set forth herein, GFL prevails on its First Claim for Relief (Breach of Contract – Title Policy) and is awarded compensatory damages for this claim and its concomitant claim as to breach of the implied contractual covenant of good faith and fair dealing. All other

Claims for Relief are denied and dismissed for the reasons set forth below.  Attorneys' fees, costs, and arbitration fees and costs are awarded as set forth herein.

## PARTIES

Claimant, Good Funds Lending LLC ("GFL"), is a Colorado limited liability company which is in the business of making commercial loans secured by real property such as the one involved in this action.  Respondent, Westcor Land Title Insurance Company ("Westcor"), is a California corporation doing business in Colorado as a title insurance company providing such policies to owners and lenders.

GFL is the insured under the Title Policy issued by respondent Westcor, Westcor Policy No. LP-13-3298733, which insures the priority of GFL's first lien Deed of Trust encumbering certain property known as 717 Midland Avenue, Manitou Springs, Colorado ("Property") against loss for the risks covered by the Title Policy.  GFL Ex. 1A.

## FACTS

**The Purchase and Loan Transaction.**  The transaction between GFL and its borrower, C3 Investments LLC ("C3"), evidenced a loan by GFL to C3 of $220,700.00 ("Loan") pursuant to a Promissory Note ("Note") in that amount secured by the lien of the insured Deed of Trust ("Deed of Trust").  GFL contacted Unified Title Company, LLC ("Unified"), and provided instructions to Unified as to how to proceed with respect to closing the transactions and issuing a title insurance commitment relating to the Deed of Trust to be insured.

On or about September 9, 2013, Unified issued a commitment for title insurance through Westcor ("Commitment"), which contained certain exceptions against which insurance would not be provided.  The Commitment provided that certain Exceptions from coverage of the Title

2

Policy to be issued, relating to matters which a correct survey and inspection of the land would disclose and which are not shown by the public record, would be removed as Exceptions from coverage upon receipt of an improvement location certificate ("ILC") satisfactory to Westcor which would also permit the issuance of a Form 100 endorsement to the Title Policy broadening coverage to insure GFL against loss or damage sustained by reason of the existence of encroachments of buildings, structures or improvements or any encroachments located on adjoining lands which affected the secured Property.

By email of September 16, 2013 (GFL Ex. 4I), Todd Hoffman of GFL advised Unified Title that a closing protection letter was also required for GFL to make the loan to C3 for its acquisition of the Property. GFL provided Unified with its "title & settlement agent requirements letter" containing general loan information, title loan policy requirements and other closing instructions in summary form.

**Closing Instructions.** The Closing Instructions of September 24, 2013 prepared by GFL ("Closing Instructions") and sent to Unified, the Closing Agent, were very specific. They constitute a contract between Unified and GFL. Among other things, they required "Extended Coverage" including certain ALTA endorsements to the policy, deletion or removal of the Standard Printed Exceptions (1-4) and the requirement that the Loan Policy ensure that GFL was the first and only lien as an encumbrance against the Property with the exception of property taxes and assessments not past due. GFL Ex. 1C. The Closing Instructions did not require Unified to acquire or obtain a physical survey of the Property.

Unified's escrow officer and closer advised the buyer's agent (Mr. Gondolfo as the broker for C3) that Unified was requiring an ILC on the Property which was to be ordered by the

purchaser (C3) with a copy to be provided to Unified.  The email string provided in GFL Ex. 6A

does not reflect the inclusion of GFL as a party notified by Unified or C3 of the ILC requirement

and it is not mentioned as a requirement in the Closing Instructions.  GFL Exs. 1C and 4I.  Nor is

there any requirement in the Closing Instructions that an ILC be obtained, provided or forwarded

to GFL.  The Closing Instructions did require that the Survey Exception be removed or deleted

from the Commitment and not be part of the final Loan Policy.[1]  There is no evidence that

Unified knew that GFL wanted a copy of any ILC or survey of any kind prior to closing.

There is no provision of the Closing Instructions requiring delivery of a survey or an ILC

to GFL prior to closing except general language that certain items were to be provided to the

lender at least two full business days prior to the Closing Date or are not acceptable to the Lender

for any reason:  ". . . a Title Commitment, a Closing Protection Letter Verification . . . or other

settlement agent and/or title documentation. . . ."  *See* Westcor Ex. W-9.

Among other provisions, the Closing Instructions contain the following provisions:

"Applicable Law" as a definition relating to state and federal "laws and regulations that apply to

mortgage lending and real estate transactions for property located in a given state (¶4a); "Closing

Documents" as a definition of all of the Loan Documents, recordable documents and "any other

documents required for completion of closing" (¶4g); "Loan Documents," meaning all the

documents required by the Lender to close the loan (¶4u); a "savings" clause directing that any

contradiction between the terms of the Final Closing Instructions and "terms that best preserve

the rights and financial interests of the Lender shall control and govern" (¶15); that Unified must

---

[1] It appears that Mr. Hoffman and GFL were not notified about the ILC because Unified was dealing with the immediate parties to the purchase contract between Mr. Brock as seller and C3 as purchaser, both of whom had selected Unified as the closing agent under that contract prior to GFL's advice to Unified that it was the lender in the transaction.

get written clarification and approval from GFL if there is any contradiction between the terms of the Final Closing Instructions and the terms of the title commitment (¶17); that the Title Policy must ensure that lender's Deed of Trust creates a valid lien on the Property as a first priority encumbrance (¶23); Unified could not disburse the loan proceeds unless until all of the conditions in the Final Closing Instructions had been satisfied (¶38); after closing Unified was required to deliver various types of documents to GFL, none of which relate to the Survey Exception or the deletion of exceptions in the Commitment (¶¶43 and 44).   Additionally, the Final Closing Instructions required that Unified "shall not close if all Requirements of the Title Commitment are not met at or prior to the closing. . . ."  (¶45).

None of these provisions required Unified to deliver the ILC or any other document on which it relied to GFL as a precondition of closing or as a supplement thereto.

**Commitment for Title Insurance Policy.**  The Commitment, issued by Unified as an agent for Westcor, was for both an Owner's Policy favoring C3 as well as a Loan Policy favoring GFL, in the face amount of $220,700.00.   It provided that certain Requirements were a prerequisite to the issuance of the Loan Policy, including Requirements B and D which required "a satisfactory improvement location certificate" "[which] must be furnished to the Company [Westcor].  Exception will be taken as to adverse matters disclosed thereby.  This requirement is necessary to provide owners extended coverage as requested in the contract. . . .   Upon receipt [of the ILC] . . . satisfactory to the company, then printed exceptions No. 1, 2, 3 and 4 of Schedule B, Section 2 hereof will be deleted from the Loan Policy when issued . . . [and] Form 100 will be attached thereto."  Westcor Ex. W-10.  Exceptions 1 and 2 deal with off-the-record risks of claims of parties in possession or easements not shown in the public records.

Exception 3 relates to "discrepancies, conflicts and boundary lines . . . encroachments, and any facts which a correct survey and inspection of the land would disclose and which are not shown by the public record."  Exception No. 4 is a mechanic's lien exception.

**Closing Protection Letter.**  On September 17, 2013, Westcor issued its Closing Protection Letter to GFL.  Westcor Ex. W-12 at 2/4.  Among other things, the Closing Protection Letter contained Westcor's promise to reimburse GFL for actual losses incurred in connection with the closing of the loan transaction involving the Property and C3 arising out of the failure of the Issuing Agent (Unified) "to comply with your written closing instructions to the extent that they relate to the status of title in [the Property] or (B) the obtaining of any other documents specifically required by you but only to the extent the failure to obtain the other document affects the status of the title to that interest or land or the validity, enforceability and priority of the lien of the mortgage on that interest . . . ."

Section 1A of the Conditions and Exclusions of the Closing Protection Letter contains other exceptions to coverage of the Closing Protection Letter including fraud, dishonesty or negligence of the Issuing Agent (Unified) and handling the lender's funds or documents in connection with the closing insofar as it relates to such dishonesty relating to the status of title or the validity, enforceability and priority of the lien mortgage of that interest in land.  There are also exclusions in the Closing Protection Letter which provide no coverage for loss arising to GFL arising out of the failure of Unified to comply with GFL's Closing Instructions which "require title insurance protection inconsistent with that set forth in the title insurance binder or Commitment but that instructions requiring the removal of a specific exceptions to title or in compliance with requirements contained in the Commitment will be covered."

6

The Closing Protection Letter goes on to state that "The Issuing Agent (Unified) is the Company's [Westcor's] agent only for the limited purpose of issuing title insurance policies . . . [T]he Issuing Agent [is not] the Company's agent for the purpose of providing other closing or settlement services."  This provision of the Closing Protection Letter is at variance with the terms of the Issuing Agency Agreement between Westcor and Unified dated February 20, 2007, GFL Ex. 5A ("Agency Agreement").

**Unified Title as Agent of Westcor.**  The Agency Agreement appoints Unified as the representative of Westcor for the issuance of title insurance policies and related commitments to ensure the title to the Property but it also requires that Unified "Conduct or participate in any settlements and closing of escrow transactions in which Policies of the Underwriter [Westcor] are to be issued in accordance with prudent practice . . . the instructions of the parties . . . and the laws and governmental regulations applicable thereto, and shall not represent to the public that it is the agent of the Underwriter for the purpose of establishing and closing any such escrow." It also requires compliance with licensing and governmental regulations relating to Unified's business, including insurance regulations of Colorado.

These provisions create an agency relationship between Westcor and Unified, not only as to the issuance of commitments and policies of title insurance as contracts between the insured and Westcor, but also with respect to the conduct of closing transactions thereby subjecting Westcor to vicarious liability for the actions of Unified for a breach of its obligations in settling and closing transactions and performing under escrow instructions.  *See Luan v. Advanced Title Ins. Agency*, 2015 WL 4560383 at 1-3 (D. Utah 2015) (express authority found in similar agency

agreement, particularly through the requirement to conduct escrow transactions, despite language against public disclosure of that agency).

**Amended Commitment.**   Unified issued Westcor's Amended Commitment for title insurance on September 18, 2013, deleting Requirement B from the prior Commitment which mandated the acquisition of a satisfactory ILC.   GFL Ex. 1B. Similarly, Requirement D was rescinded because of the fulfillment of the ILC requirement.   At this juncture, Unified had fulfilled the requirement of the Closing Instructions that "standard printed exceptions (1-4) . . . are deleted on the loan policy. . . ."   GFL's Ex. 4I at 3/3 (GFL000041); GFL Ex. 1B.   GFL had issued an email to Unified requesting certain changes to the language of the Commitment on September 18, 2013 (Ex. W-11) to which Unified responded in an email of September 23, 2013, transmitting a revised Commitment to meet GFL's requests and confirming that the required Exceptions had been deleted as required by the Closing Instructions.   Ex. W-22.   Nowhere in that exchange of emails or in the documents relating thereto is there any mention of an ILC, a transmittal of the ILC or a request by GFL for a copy of any document upon which Unified/Westcor relied for removal of the Survey Exception.   Apparently GFL was pleased to get a Commitment complying with its Closing Instructions and did not inquire further.

**Unified Did Not Breach the Closing Instructions.**   Paragraph 59 of the Final Closing Instructions contains a broad requirement in Unified's duties that it should not close without further approval by GFL if:

> If . . . any one or more of the following circumstances is known or should have been known by a reasonable person in the normal exercise of its duties) by Closing Employee to exist during any stage of this transaction, settlement agent [Unified] must immediately contact Lender and postpone signing or disbursement of the Loan until Settlement Agent receives written permission to

> proceed from Lender's Contact . . . :  (a) any material fact that may, in the reasonable opinion of Closing Employee, have an impact on Lender's decision to make the loan . . . [including but not limited to] . . . any significant information or changes in the value or title of the Property . . . (e) recent adverse changes to the condition of the Property including fire, flood, regional disaster or other damage. . . .

Additionally, all of the requirements of the Title Commitment were to be met prior to closing as a condition of closing the loan by Unified as the Settlement Agent.  GFL Ex. 1C at 15/16.  Further, Unified was required not to close or disburse loan funds if the requirements of the Title Commitment were not met prior to closing.   The Amended Title Commitment deleted Exceptions 1, 2, 3 and 5.  The Closing Instructions required that all documents executed by the borrowers or other parties in conjunction with closing were to be delivered to the lender.  Closing Instructions at 15/16, Items (m), (n) and (o).  They also required post-closing delivery to lender of "non-recorded documents."  GFL Ex. 1-C at 16.  Nothing in the Final Lender Closing Instructions provided Unified by GFL required the delivery or disclosure to GFL of any document showing the basis for the removal of the Survey Exception as deleted in the Title Commitment under Requirement B.

Therefore, although Westcor is vicariously liable for the acts of Unified as the Settlement Agent, Unified did not breach the Closing Instructions, having complied with GFL's requirements to provide a title insurance commitment free from the Survey Exception.  The failure of GFL's Closing Instructions to specifically require pre-closing documentation of the basis for removal of the Survey Exception was a risk borne by the drafter, GFL.  *See Cheyenne Mtn. School Dist. No. 12 v. Thompson,* 861 P.2d 711, 716 (Colo. 1993) ("In case of doubt, a contract is construed most strongly against the drafter.").

Although Unified is indeed the agent of Westcor while operating as a Settlement Agent under escrow instructions, GFL's Closing Instructions were not violated unless the "catchall" provision (regarding reasonable basis to believe that lender's interest would be impaired) can be found. That is not the case. GFL had the opportunity to insist on a current and accurate survey and physical inspection of the Property in its Closing Instructions and did not do so, but simply required that it be protected under the terms of the Loan Policy as to those risks. GFL accepted the title insurance Commitment as amended and was satisfied with the mere removal of Requirement B without more. Further, it is clear that Unified, by requiring an ILC, relied on an ILC provided by Mr. Alessi as the basis for removal of that Requirement. That decision was within the good faith discretion of Unified as an underwriter and agent for Westcor.

GFL Ex. 6-E at Page 3 shows the Alessi Improvement Location Certificate ("Alessi ILC") and contains a Surveyor's Certificate in compliance with Colorado law under C.R.S. §38-51-109. The Alessi ILC makes it perfectly clear that it is not intended to be a land survey, an improvement land survey plat, or to be relied upon for the establishment of future improvement lines, but only demonstrates that "the improvements . . . are entirely within the boundaries of the parcel except as shown and that there is no apparent evidence or sign of any easement crossing or burdening any part of said parcel except as noted [there were no notes]." The reference to "asphalt" in the northeast corner of the Property as it abuts Midland Avenue does not reflect either the encroachment of an asphalt driveway onto someone else's property or the encroachment of an asphalt driveway on someone else's property onto the subject Property encumbered by GFL's Deed of Trust. The Alessi ILC does not, in and of itself, alert the reader

to the existence of an encroachment in either direction.[2]  The Alessi ILC did not put Unified or Westcor on notice of the claims of the adjacent neighbor at 713 Midland (Mr. Foos), and Unified was entitled to rely on the Alessi ILC in its business decision to delete the Survey Exception, albeit at its peril.

**Third Claim for Relief (Breach of Contract – Closing Instructions) Dismissed.** Although Westcor is vicariously liable to GFL if Unified breached the Closing Instructions contract, there was no breach of the Closing Instructions, either as to the specific requirements or as to the general "catchall" requirement, in that Unified was not on notice of the issue by reason of the Alessi ILC.  Had GFL wanted survey protection in full, it could have expressly required a full and complete survey prior to closing and had that survey specifically insured in the Loan Policy.  For these reasons Respondent's Motion to Dismiss GFL's Third Claim for Relief (breach of Closing Instructions) is denied but GFL's Third Claim for Relief (Breach of Contract – Closing Instructions) is dismissed with prejudice.

The final lender's Title Policy was transmitted by Unified to GFL on November 27, 2013 (Ex. W-26).  The terms of that Policy have never been objected to by GFL.  It is not asserted that the Title Policy is at variance with the terms required under the Closing Instructions and, indeed, it specifically deletes Exceptions 1, 2, 3 and 4 of Schedule B.  However, the rest of the story is at issue in this dispute.

---

[2] GFL admits this, impliedly, in GFL's Ex. 3-O (Fig. 7) which refers to the "cropped portion of the pre-purchase ILC [which] shows driveway starting on neighbor's property when examined in the context of a parcel map (since driveway shown on straight edge of pie-shaped parcel).  This requires evidence extrinsic to the Alessi ILC and some combination of local knowledge beyond that shown in the document.  It is not at all demonstrable that the ILC, in and of itself, provides adequate notice of claims to use or title of any portion of the Property by the adjacent property.

**Fourth Claim for Relief (Breach of Fiduciary Duty).**  GFL's Fourth Claim for Relief (breach of fiduciary duty by Unified as the Settlement Agent and vicarious liability alleged against Westcor), follows much the same approach and result but for slightly different reasons. GFL asserts that the agency created a fiduciary relationship between them for which Westcor is vicariously liable.  Westcor's Motion to Dismiss contends that such liability is precluded by Colorado's Economic Loss Rule.

The Economic Loss Rule of *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256 (Colo. 2000), precludes the prosecution of a tort claim for economic loss from breach of a contractual duty unless the tort claim is based upon and its damages derive from the breach of an <u>independent</u> duty of care under tort law.  *AZCO, supra* at 1264.  *See, First Franklin Financial Corp v. United Title Co., Inc.*, 2009 WL 3698526 at 2 (D. Colo. 2009).  Therefore, in order to avoid the application of the Economic Loss Rule, two things must occur:  an independent duty must be pleaded and a tort claim must be based upon breach of that independent duty.  If the allegation of the tort claim is that the breach of contractual promises is the basis of the tort claim, it must fail.  In the instant case, GFL has pleaded both a contractual fiduciary duty and a tort claim based upon that contract.  Did GFL also plead an independent duty sufficient to support the tort claim?  It did not.  Consequently, the Motion to Dismiss GFL's Fourth Claim for Relief (Breach of Fiduciary Duty) is granted.

GFL relies on regulatory mandates in ¶7 of the Initial Claim, but those mandates do not provide, nor has any authority been shown to the contrary, that insurance regulations provide for a private cause of action in tort or a duty independent of the Closing Instructions.  Further, if the alleged duty exists under the contract and the alleged breach would constitute a material breach

of the contract, the Economic Loss Rule bars the tort claim.   If the alleged duty exists independent of the contract and would not constitute a material breach of the contract, the Rule does not bar the tort claim.   *A Good Time Rental, LLC v. First American Title Agency, Inc.,* 259 P.3d 534, 537 (Colo. App. 2011); *see also BRW, Inc. v. Dufficy & Sons, Inc.,* 99 P.3d 66, 74 (Colo. 2004); *AZCO Constr., Inc.,* 10 P.3d at 1263.   The former, not the latter, is true.   Indeed, the Closing Instructions, a contract, incorporated a covenant of compliance with "Applicable Law" such that, even if insurance regulations were applicable, the duty of compliance with them is contractual and not independent.   Closing Instructions, Ex. W-26 at ¶¶4(a) and 60.

**Fourth Claim for Relief (Breach of Fiduciary Duty Dismissed.**   Therefore Westcor's Motion to Dismiss GFL's Fourth Claim for Relief is granted.   Whether or not the Motion to Dismiss is granted makes no difference because there is no proof of breach of either a tort or contractual duty arising under the Closing Instructions, as discussed above.   There is no proof that the Alessi ILC would or did alert Unified to adverse facts affecting title or boundaries, nor is there any evidence that Unified had independent knowledge of such facts.[3]   It was also apparent that Westcor does not, as a matter of its own practices, require delivery of all of the documentation supporting the issuance of a policy of title insurance to its home office, or indexing or other archiving.   Although this is a weakness in its system in some instances, leading to the criticism that Unified or Westcor should have had the benefit of knowledge of the Foos driveway issue from that closing, it cannot be said that either Unified (presumably unaware of the Foos ILC prepared by Crossed Paths Surveying/Brinkman, GFL Ex. 3B) acted in breach of

---

[3] Much has been made of the fact that Westcor issued a policy of title insurance on 713 Midland Avenue, property presently owned by Mr. Foos, and that in the course of that closing its Settlement Agent, Empire Title, came into possession of an ILC which depicted the same driveway issue as has caused this dispute.

its obligations under the Closing Instructions or otherwise misled GFL.  Nor can it be said that Westcor, lacking the same knowledge, has violated any duty to GFL.

It well known that title insurers do not expressly assume the role of searching the chain of title to the insured property, nor does a commitment to insure a "loan policy expressly assume the responsibility of disclosing all title defects discovered."  The title insurer is merely describing the risks it will undertake in issuing the policy subject to exclusions, exceptions and requirements; "the rights and duties of the parties are fixed by the contract of insurance."  *Horn v. Lawyers Title Ins. Corp,* 557 P.2d 206, 208 (N.M. 1976) (title insurers have no duty under the policy to search the records and any search undertaken is purely for its own protection as an indemnitor in determining what losses will be covered under the policy.)  *See* 1 Title Ins. Law § 12:3 (2018 ed.).

Consequently, Westcor did not have a duty to search or survey the title to 717 Midland Avenue or have knowledge of the conditions of the adjacent property at 713 Midland Avenue at the time of issuing the Title Policy, absent a request or requirement of GFL to acquire a full and complete survey or otherwise assure that there were no issues with respect to adjoining property. Instead, Westcor determined to insure the lender's rights in the Property based upon Unified's determination that the Alessi ILC did not alert them to such issues but otherwise assumed the risk thereof in accordance with the terms of the Title Policy.  It owed no independent duty to search and disclose defects in title to GFL.  Therefore there is no independent duty in tort devolving upon Westcor or its agent Unified to support a tort claim for breach of fiduciary duty which is not otherwise barred by the Economic Loss Rule.  For this reason Westcor's Motion to Dismiss GFL's Fourth Claim for Relief (Breach of Fiduciary Duty) is granted, but the claim also

fails for a lack of proof of breach of Unified's obligations under the Closing Instructions or any independent tort duty.

**GFL's First Claim for Relief (Breach of Contract – Title Policy).** The evidence shows that GFL became concerned about the condition of title and the status of the Title Policy as early as February 3, 2015. GFL Ex. 1A at 11/86. Mr. Hoffman of GFL corresponded with his borrower, Tristan Cravey of C3, and Amanda Shirm of Unified Title. Ms. Shirm sent him the Loan Policy, being the Title Policy which is the subject of this dispute. GFL Ex. 1A. On March 9, 2015 GFL asked its borrower, C3, if it had submitted a title insurance claim for 717 Midland Avenue. GFL Ex. 10P at 2/6. As of this time it is clear that GFL was relying on its borrower to file a claim under the Owner's Policy of title insurance since C3 had no standing to do so under GFL's loan policy. By July 9, 2015 GFL was advised of the claim of Mr. Foos, the adjacent landowner at 713 Midland Avenue, to a portion of the asphalt area. Mr. Foos stated in his letter to Mr. Cravey, with a copy to Mr. Hoffman of GFL, that he was "in possession of a current improvement location certificate and the survey pins are very well marked, especially the front corner pin in the old parking spot." GFL Ex. 3S. It is clear from that letter that Mr. Foos was looking for a solution to both the retaining-wall problem and the parking-space issue by this notification and was disappointed that "no communication for a plan of action has ever been mentioned. . . ."

By email to GFL's Mr. Hoffman on June 14, 2015, C3 Investments had transmitted the Alessi ILC to GFL, possibly the first time that GFL had seen that document, and Mr. Cravey of C3 asked GFL if it thought the Alessi ILC "affects making a title claim from my perspective (having an ILC) before closing?" Approximately eight hours later Mr. Hoffman of GFL

expressed surprise at receiving the Alessi ILC, apparently not knowing anything about it, asking

who had received it and why it didn't show up on the Commitment.  It is evident from previous

correspondence that the Alessi ILC had been ordered on behalf of C3, who paid for the Alessi

ILC.  Plaintiff's Ex. 6E at 2/3.  However, even before receiving the Alessi ILC from Mr. Cravey

of C3, Mr. Hoffman of GFL had advised Westcor, by letter of June 10, 2015, of two claims on

the Title Policy.  One claim was "regarding the impaired access to the detached garage structure

of the property" by reason of the driveway commencing on the 713 Midland Avenue parcel

adjacent to the subject Property (Mr. Foos having acted to block access to the garage by parking

his car on his own property or on the asphalt claiming rights to that property) and a claim for

violation of a "two-story unpermitted addition" as covered within Section 5 of the Covered Risks

of the Title Policy (violation of any law, ordinance, permit or governmental regulation. . . ."  By

this time C3's loan with GFL was in default, GFL intended to foreclose, and GFL was making a

claim under the Loan Title Policy and would accept $150,000.00 in settlement thereof.  Various

documents were attached to this Notice of Claim, including municipal code violations issued by

the Pike's Peak Regional Building Department in conjunction with the City of Manitou Springs.

**Westcor Responses to GFL Claims.**  Unified acknowledged receipt of GFL's Notice of

Claim by email of June 17, 2015.  GFL Ex. 8D at page no. WESTCOR00030.  This is Westcor's

notice to Unified about GFL's Notice of Claim.  Westcor's claims counsel inquired of its title

agent Unified (Mr. Fred Deming) and asked for a complete copy of Unified's file.  By email of

June 17, 2015, Ms. Riggs, claims counsel for Westcor, acknowledged receipt of "a potential

claim" under the Title Policy and advised that "we will be in contact with you shortly."  *Id*.

WESTCOR00035.  Westcor acknowledged that it had begun an investigation of the claim as of

that date.  On Friday, June 19, 2015, Mr. Deming of Unified indicated to Tiffany Riggs of

Westcor that he did not "have anything in the file other than the attached ILC," being the Alessi

ILC.  By letter of July 2, 2015, Ms. Riggs of Westcor wrote to GFL advising that she understood

his claims to have been tendered "in connection with an alleged lack of access to the garage and

an improvement that was built without a permit."  She recites the basic facts and then describes

that, "according to your tendered claim submission, access to a detached garage in the Property

is being blocked by the neighbor because the driveway begins on the neighbor's property.

Additionally you state that due to the shape, slope and municipal restrictions on the Property, it

does not appear to be feasible to start the driveway on the Property.  Further, according to the

Pike's Peak Regional Building Department there is an unpermitted two-story addition to the

structure on the Property. . . ."  GFL Ex. 8D at WESTCOR00047.  Ms. Riggs notes that the

Alessi ILC "shows that the asphalt driveway connected to the garage abuts a public road [and]

"as such there is legal access to the Property and the Garage."  Ms. Riggs correctly advised that

the unrecorded violation of an ordinance is not covered by the Title Policy.  *Id.* at

WESTCOR00048.  However, Ms. Riggs' letter does not acknowledge the effect of Form 100

relating to "encroachments of buildings, structures or improvements located on the land onto

adjoining lands or any encroachments onto the land of buildings, structures or improvements

located on adjoining lands."  Form 100 at ¶1(c).

This raises the question of whether Covered Risk No. 5 (recorded notice of violation of

law of municipal ordinances and regulations, excluded if unrecorded at the time of issuance of

the Title Policy, as in this case) is otherwise covered under Form 100.  An unpermitted building

located on the Property, where such violation is unrecorded at the time of the issuance of the

Title Policy, is not covered under Form 100 either.  The breach of a regulatory condition is not within the purview of Form 100 by its own terms.  It is not an encroachment, a covenant violation, a recorded restriction or any risk expressly set forth in that Endorsement. Consequently, Ms. Riggs' denial of coverage for the unpermitted two-story addition to the structure on the Property is correct.  However, there is more to consider.  Ms. Riggs' analysis of the claim in her letter to Mr. Hoffman of July 2, 2015 characterizes the asphalt driveway issue as an access problem seeking coverage under Covered Risk No. 4 of the Title Policy.

Covered Risk No. 4 provides for coverage against loss or damage sustained or incurred by the Insured (GFL) by reason of "no right of access to and from the Land."[4]

Based upon the information presented to her at the time, Ms. Riggs' denial of coverage under a right of access theory appears appropriate since no evidence was before her which demonstrated that the asphalt driveway connected to the garage did not abut a public road or that access was otherwise restricted.  The Alessi ILC did not, on its face, reflect a denial or impairment of legal access to the Property or the garage.  It is the very nature of an ILC, in the absence of a complete survey, that it does not reach that issue under these circumstances. The Alessi ILC depicted an asphalted area but it did not depict that area as an encroachment either by or against 717 Midland Avenue or 713 Midland Avenue.  Therefore, based upon the information then known, Ms. Riggs' letter denying coverage for this "access problem" would appear to be correct unless otherwise covered pursuant to Form 100.

---

[4] "Land" is defined as the real property described in Schedule A of the Title Policy but "does not include any property beyond the lines of the area described in Schedule A nor any right, title, interest, estate or easement in abutting streets, roads, avenues . . . . but this does not modify or limit the extent that a right of access to and from the Land is insured by this Policy."  Title Policy, Conditions and Stipulations, Definition of Terms (i).

"Company insures GFL against loss or damage sustained by reason of] encroachments of buildings, structures or improvements located on the land onto adjacent lands or any encroachments onto the land of buildings, structures or improvements located on adjoining lands." Form 100 at ¶ 1(c).  There is no doubt that this provision applies for the benefit of GFL. The Title Policy does not contain an exception as to matters of survey and deleted such Exceptions as required by GFL in its Closing Instructions.  By the issuance of a Form 100 and the Title Commitment and Title Policy, Westcor assumed the risk of there being an actual encroachment on the property undisclosed by the Alessi ILC.  That was a business decision for Unified as agent for Westcor and it had the opportunity to protect itself from inaccuracy by requiring a survey rather than merely an ILC.  It did not do so and therefore has assumed the risk that an actual exception or that an actual claim under Form 100 would have to be recognized. The nature of the asphalt area which apparently impedes direct access to Midland Avenue from the Property was not disclosed by the Alessi ILC, but Westcor assumed that risk when deleting Requirement B.  The characterization by Ms. Riggs at this point as an access problem rather than an encroachment problem is understandable given the information available to her at that time. The continued denial of GFL's claim may not be as justifiable.

Covered Risk 2(c) provides GFL with coverage for loss sustained or incurred by reason of "any encroachment, encumbrance, violation, variation or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.  The term 'encroachment' includes encroachments of existing improvements located on the Land onto adjoining land and encroachments of existing improvements located on adjoining land." Westcor's view here is that 2(c) does not apply to grant coverage as a Covered Risk because it

does not affect the "Title" which is defined as "the estate or interest described in Schedule A [the legal description of the Property]. Title Policy, Definition (l). Schedule A of the Title Policy describes the land by plat reference to Lot 29 of a subdivision. It describes the quality of the title as fee simple subject to the mortgage granted by C3 to GFL to secure the Loan. Therefore, since Mr. Foos' claim to 713 Midland Avenue did not affect ownership of the Property nor had any claim of ownership or encumbrance upon the title to the Property been asserted in the public records or under the facts known to Ms. Riggs at that time, no claim could be presented under 2(c) absent more facts. Again, there is nothing in the Alessi ILC that would describe a title impairment to the Property, but this depiction is necessarily incomplete by definition. I do not find that Ms. Riggs' initial response to GFL's claim was made in bad faith under the circumstances.

Since access to and from the Property did not appear from the Alessi ILC to be completely blocked ("no right of access"), it would appear that Covered Risk No. 4 would not apply. On the other hand a two-dimensional drawing without a current survey did not tell the entire tale given the topography and improvements that existed but are not shown on that document. Nevertheless, Ms. Riggs' failure to find coverage under Form 100 at ¶ (c) is not understandable inasmuch as the "asphalt" shown on the ILC must be a "structure" of some type indicating an encroachment, except that the Alessi ILC reflects all of the asphalt is within the boundaries of the Property.

Thus, the initial denial of both types of claims was not itself made in bad faith. However, there are other circumstances to consider.

On or about June 25, 2015, GFL commenced foreclosure of the lien of its Deed of Trust against the Property by reason of default and the payment and performance of the Loan Documents by C3.   On or about December 10, 2015 Mr. Hoffman of GFL wrote to Jim Brinkman, CLS, transmitting a copy of the Title Policy to him and asking for "survey information" in order to confirm "evidence for claim on Title Policy" and estimating value based upon any encroachment. . . ."   Mr. Brinkman offered an improvement location certificate for $300.00 or a land survey plat for $1,800.00.   Ex. W-89.   Mr. Brinkman, a surveyor, developed a land survey plat for the Property (rather than an ILC) on or about December 22, 2015. GFL Ex. 3C.   The Brinkman Survey is markedly different from the Alessi ILC, particularly as to the asphalt driveway area in the northeast corner of the Property as it adjoins or abuts 713 Midland Avenue.   The Brinkman Survey reflects a "nail" in the asphalt, apparently at or near the northeast corner of the Property as it adjoins 713 Midland (Lot 30).   It also demonstrates that the northern line of the asphalt driveway does not abut the public street at Midland Avenue. There is a triangular area that does not belong to Lot 29, nor was it insured as a part thereof under the Title Policy, which creates a gap between the northern line of Lot 29 and the right-of-way of Midland Avenue.   Mr. Brinkman marks this area as "access rights unknown."   There are also some minor encroachments of the eaves of a two-story house toward the eastern property line at Lot 29 overhanging a small distance into Lot 30, and a similar "apparent encroachment" as to a shed in the southeast corner along the adjoinder line between the two lots.   Plaintiff's Ex. 3C.   *See also* Ex. W-1.

GFL sent additional claim information to Tiffany Riggs of Westcor on January 4, 2016. GFL Ex. 3N.   Mr. Hoffman of GFL advised her that additional information was being provided

as an update to the claims filed on or about June 15, 2015, approximately six months earlier. With respect to "Insurance Claim 1," relating to the "title issue" (for loss of access and use of driveway), Mr. Hoffman provided the Brinkman Survey as additional evidence of the driveway-garage impairment, the encroachment of the house onto Lot 30 (Foos property) and the shed encroachment, along with the "apparent encroachment" of a wood privacy fence, being a total of four claims against the Policy.   Mr. Hoffman asserted that the access claim involving the driveway or asphalt area was under Covered Risk 2(c).   Although he characterizes the access claim as something which would be disclosed by an accurate and complete survey of the land, he also relies on Covered Risk 4 (no right of access to and from the land).   This letter also asserts "strong evidence of Westcor's failure to perform its duties of good faith and fair dealing" because it did not disclose over-coverage for these claims under the Policy even though Covered Risk 2(c) might not have been applicable.   It also asserts a failure to reasonably investigate or otherwise settle the claim.   GFL asks for payment of the outstanding balance on the loan together with its survey costs of $1,800.00.

By email of February 8, 2016 Mr. Hoffman of GFL again wrote to Ms. Riggs of Westcor, forwarding a Statement of Loss with an attached Ex. A thereto.   Ex. W-3.   The transmittal included a number of drawings, compilations and some overlays reflecting the driveway issue. The Proof of Loss Statement of February 8, 2016 recites the claims of the previous correspondence and reminds Westcor that as of June 2015 GFL had asked to resolve the claims without unreasonable delay and that Westcor had declined to make an offer or "otherwise resolve the issue in a reasonable period of time."   GFL asserts that its losses include all the sums due under the Note in addition to the costs of survey and other costs.   He further asserts that the

22

source of the entire problem is the blockage of the driveway due to the impairment of the encroachment to or from Lot 30, the Foos property.  This prevented access to the improvements to 717 Midland Avenue for repair and rehabilitation.  GFL asserts its estimated losses through February 10, 2016 to be between $212,242.14 and $227,243.14.  Mr. Hoffman again asserted that Westcor had failed to perform its duties with good faith and fair dealing, claiming lack of coverage as to the driveway impairment because it did not include reference to Covered Risk 4, even though it is clearly covered elsewhere in the Policy under Covered Risk 2(c), and that Westcor failed to investigate within a reasonable period of time or attempt to otherwise resolve the claim.  He also asserted that Westcor is responsible for its agent "who also failed to disclose to the lender their pre-purchase ILC which" showed the driveway access at least partially begins on adjacent property, a fact which is clear when that pre-purchase ILC is examined in the context of county parcel maps pointed out in the July 27, 2015 email."  The underlined portion above indicates that GFL was well aware of the fact that the Alessi ILC did not, by itself, provide enough evidence to call into question the access problem, but rather, that problem would have to be evidenced by comparing and contrasting the Alessi ILC to other documents.

The foreclosure sale under the Deed of Trust occurred on February 10, 2016.  GFL was then owed $285,350.19 according to its bid sheet.  GFL Ex. 10K.  GFL bid $59,999.00 but the actual sale price of the Property to a third party was $87,000.00 as tendered by Castle County Investments LLC.  Ex. W-95.

Therefore, as of February 10, 2016, and by its own admission, GFL was owed $285,350.19 less $87,000.00 received from the foreclosure bid by Castle Construction, for a net deficiency of $198,350.19 together with $1,820.25 for the Brinkman Survey.  Ex. W-96.

On May 6, 2016, Mr. Hoffman, for GFL, advised Ms. Riggs that he was updating the proof of loss statement, claiming that the driveway-garage impairment is clearly covered under Covered Risk 2(c) and that "the consequential damages of the title issues and Westcor's breach of contract and failure to act in good faith through February 10, 2016 [the foreclosure date] are $200,242.14." This is the deficiency plus some small amount for the attorney's fees and the cost of the land survey plat from Mr. Brinkman. He also asserted that Westcor had repeatedly stated that the driveway-garage impairment was not covered under 2(c) several times, and has failed to reasonably investigate and otherwise settle the claim. He also claimed again that the failure of the Westcor closing agent to disclose the Alessi ILC prior to closing was improper.

On or about May 10, 2016 the adjacent owner, Mr. Foos, apparently came to an agreement with the foreclosure purchaser or its successor in interest with respect to the driveway area, the related wall structures that had been in controversy, the encroachments of structures and a plan of resolution with respect to the issues relating to the encroachments, the driveway and restoration of the 717 Midland Avenue house by a new owner. GFL Ex. 3X. By email of June 7, 2016, GFL asserted to Westcor's representative that Westcor's activities are considered by GFL to have been in bad faith. Again, GFL sought to resolve coverage under Covered Risk 2(c). Ex. W-5.

On December 20, 2016, Mr. Foos and Silver Summit GC, LLC, resolved the driveway problem through the grant of an easement recorded in the Clerk and Recorder's Office of El Paso County, Colorado. GFL Ex. 3F. That transaction occurred incident to Silver Summit's acquisition of Lot 29 at 717 Midland Avenue which was closed by Unified Title pursuant to a title insurance commitment issued by Westcor which required an Improvement Location

Certificate prior to closing or a prior version thereof, and the coverage was subject to the terms and obligations of the above-referenced grant of easement.  It is interesting but not probative. The facts do, however, demonstrate that Mr. Foos was amenable, at some point, to finding a solution to the common problem of the driveway and to accommodate the improvement of Lot 29 and its structures.

It is of interest why neither Westcor nor GFL made direct efforts to resolve claims with Mr. Foos.  It is understood from the testimony that Mr. Foos did not like C3 Investments or Tristan Cravey, but it is not at all clear why, once Mr. Cravey was out of the picture, either by foreclosure or by abandonment of the property prior thereto, Mr. Hoffman and GFL could not have reached the same accommodation as Silver Summit or whether they even attempted to do so.  Similarly, Westcor apparently took little if any action to further investigate and resolve the claims.

Westcor's File Notes, GFL Ex. 8E, begin in mid-June 2015 and reflect little action other than correspondence.  For example, these File Notes recognize that GFL has raised a problem with respect to access to its garage, requested information from its agent (Unified) and determined that, since the Property "abuts public road," Exclusion 1(a) applies.  Exclusion 1(a) expressly excludes the effect of any laws or governmental regulations relating to the occupancy, use or enjoyment of the land, the character or location of improvements to the land and similar types of limitations on the Property.  Thus, the claim for an improperly permitted structure is not covered under the Title Policy.  The statement that the "Property abuts public road" could only have been made with respect to examination of the Alessi ILC, but it is well known that ILCs are themselves very limited in their depiction of the actual circumstances of the insured Property.

What then happened between July 2, 2015 (the first denial of claims) and approximately September 30, 2016 was little, if anything, by Westcor. The File Notes reflect that Westcor continued to receive claims from GFL, to deny those claims and to require GFL to provide survey evidence, a properly supported damage calculation, and reviewing that correspondence without any effort beyond that.

There is only slight evidence that Westcor properly or diligently investigated this claim. Indeed, there is no evidence that Westcor did any of the following:

(1)    Conduct a title examination of the adjacent property, Lot 30 at 713 Middleton Avenue, to determine whether it had rights of record across Lot 29, the Property. Further, it made no effort to determine whether there was anything in the public record which would have provided rights for the insured Property across Lot 30;

(2)    Recognize that another of its title agencies in Colorado Springs, Empire Title, had previously insured Mr. Foos' Lot 30, that there was an Improvement Location Certificate that had been produced with respect to that insurance policy issued by Westcor, and that there had been an Improvement Location Certificate by G&L Survey Inc. issued through Commonwealth Land Title, which could have been contacted. That document, GFL's Ex. 3L, showed the existence of a "PK Nail" at the northerly corner of Lot 30 as its property line intersected the right-of-way of Midland Avenue, thus delineating the asphalt drive issue which is marked as "neighboring asphalt drive encroaching." The same

information would have been available from Empire Title in the Foos transaction when he acquired the same property. That ILC contained an identifying mark in the recorded deed showing that Empire Title had handled the closing transaction, whose file could easily have been recovered by Westcor;

(3)     Westcor did nothing to determine the rights of the parties and the nature of the claim, the etiology of the claim, the alternatives for solutions, or whether a lawsuit would cure or establish the rights of one party over the other by adverse possession, easement by necessity, easement by implication or other legal doctrine which would have resolved the dispute judicially. It did not seek a settlement conference to resolve the parties' positions. It simply denied the claim.

Not only was the denial of claims a consistent theme for Westcor, without any serious effort to resolve it, but the file was closed on December 1, 2015 after Westcor declined to make an offer to resolve matters on August 12, 2015. The claim was then reopened but a survey demanded. Until a survey was provided by GFL, the claim was considered closed. The claim was reopened and closed more than once. Finally in June 2016 Westcor obtained Unified's escrow and closing file. The file was again closed on September 30, 2016 after Westcor's letter of July 1, 2016 had not produced any response from GFL. The last entry in Westcor's File Notes states that "Insured made claim relating to losses allegedly caused because a portion of the parking spot was over the property line. Offered settlement, Insured has not responded, closing file." GFL Ex. 8E.

Westcor (1) denied coverage for the encroachment issue or defect based upon Covered Risk 4 for (no right of access) without advising GFL as to whether there was coverage under either Covered Risk 2(c) or Form 100; and (2) made no effort to advise GFL as to other bases of coverage available under the Title Policy.  Indeed there was coverage under at least Form 100 and Westcor did not advise its Insured of that.  Instead, Westcor consistently advised the Insured that its Notice of Claim was deficient or defective, *e.g.*, it needed support by a survey to be obtained by GFL, so GFL's selection of coverages was incorrect and the Notice of Claim was therefore insufficient.  None of these things is true.  The Notice of Claim given by GFLwas sufficient to put Westcor on notice as to both the factual and practical aspects of GFL's claims for which it sought help, coverage and resolution.

Westcor's inaction in failing to fully investigate the claim, advise of potential coverages and make any attempt to cure or resolve the problem or meet its obligations to its insured under the Title Policy was most improper.  Its inaction and denial of coverage was not proven to be reckless or malicious but in all events negligent at the very least.

**Westcor Breach of Contractual Covenant of Good Faith.**  Westcor had a duty to investigate and adjust GFL's claims in good faith.  It also had a duty to look for coverage under any viable theory, and it was Westcor's job to do so.  *See State Farm Mut. Auto Ins. Co. v. Brekke*, 105 P.3d, 177, 189 (Colo. 2004); *Cal. Shoppers Inc. v. Royal Globe Ins. Co.*, 175 Cal. App. 3d 1, 56, 57 (1985); *Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062, 1072-1073 (2007).  Westcor had a duty to look for coverage even if the Insured did not properly identify the applicable clause.  Further, a reasonable investigation by Westcor would have disclosed facts showing how GFL's claims were covered and a failure to investigate those facts was a breach of

the implied covenant of good faith and fair dealing.  An insurer is allowed wide latitude in its methods and abilities to investigate claims in order to resist false or unfounded claims not available under insurance contracts. *See Farmers Group Inc. v. Williams*, 805 P.2d 419, 421 (Colo. 1991); *Travelers Insurance Company v. Savio*, 706 P.2d 1258, 1274 (Colo. 1985). Westcor exceeded that limit. Westcor has breached its contract with GFL.  However, that claim is not sustained by sufficient evidence of bad faith and even if so it barred by Colorado's economic loss rule.  *First Franklin Financial Corporation v. United Title Co. Inc.*, 2009 WL3698526 (D. Colo. 2009) (tort claim which is not supported by duty independent of contractual obligations cannot be maintained under the economic loss rule).  It is not only the conduct of Westcor which must establish the tort, but the tort itself must also stem from a duty independent of the contract under which it was initiated.  This necessary element has not been established and thus GFL's second claim for relief fails insofar as obtaining relief for bad faith breach of the title insurance contract.  Nevertheless, GFL has established Westcor's breach of the implied covenant of good faith and fair dealing present in every contract in Colorado for which it is entitled to damages.

The implication of the facts is, at most, that Westcor's officers were negligent and their conduct does not establish malice, willfulness or recklessness without regard to consequences or the rights of GFL.  There is no credible evidence that Westcor's operatives were conscious of their conduct and knew or should have known that injury would result.  Therefore, although tempted, the conclusion of bad faith is not justified under the proof or reasonable inferences from the facts established at trial.  Similarly, punitive damages are likewise inapplicable.

**First and Second Claims for Relief (Breach of Contract – Title Policy, and Breach of Covenant of Good Faith and Fair Dealing) Granted.** Westcor breached its contractual duty under the Title Policy in failing to resolve the claims and perform its obligations to GFL which were covered thereby, particularly pursuant to Form 100. Westcor also breached the contractual covenant of good faith and fair dealing which is subsumed within the relief granted herein for GFL's First Claim for Relief (Breach of Contract – Title Policy).

**Second and Fifth Claims for Relief (Bad Faith Breach of Contract and Exemplary Damages) Dismissed.** As described above, there is insufficient evidence to establish the tort of bad faith breach of the contract of title insurance or exemplary damages. The bad faith claim is also barred by the Economic Loss Rule as further discussed herein.

**Compensatory Damages for First Claim for Relief (Breach of Contract of Title Insurance).** The garage-driveway-encroachment claims relating thereto, as well as the structural encroachment claims, which were relatively *de minimis*. Nevertheless these were Covered Risks for which the Title Policy provides contractual relief. Section 8 of the Title Policy, GFL Ex. 1A, states that "the extent of liability of the Company for loss or damage under this policy shall not exceed the <u>least</u> of: (1) the Amount of Insurance, (ii) the Indebtedness, or (iii) the difference between the value of the title as insured and the value of the title subject to the risk insured against by this Policy.

Alternatively Westcor had the right to defend or otherwise cure the issues giving rise to the claims. This could have taken the form of an action to establish rights in the contested driveway area by (1) adverse possession; (2) other legal doctrine; or (3) private settlement, as

was ultimately accomplished by a subsequent owner of the Property; this was not accomplished by Westcor.  Therefore we are left with a determination that the least of the three options applies.

The only evidence as to diminution in value of the Title was presented by Westcor through Mr. Clayton's opinion that the diminution in value is equal to the cost of cure $1,300.00. There was no impaired value evidence or  testimony as to the value of the remainder of the Property tendered by either party.  Mr. Clayton's opinion is too limited to be probative of this issue.  Clearly the Property had $87,000.00 of value at the time of foreclosure as established by third-party bid at public auction.  GFL did not introduce any other evidence of diminution of value of the Property or that its $59,999.00 bid was based upon the adverse impact of the driveway impairment or other encroachment issues.  There is, therefore, insufficient evidence for a determination of diminution in value as a measure of damages or limitation of other measures of damages.

The next choice is under Section 8(a)(ii), the Amount of the Indebtedness.  Indebtedness as defined in Section 1(d) of the Title Policy is as follows:  the amount of principal disbursed as of the date of the Policy together with post-issuance of disbursements of principal or construction loan advances, interest on the loan, prepayment premiums and similar fees or penalties owed by law (as well as the expenses of foreclosure and any other costs of enforcement).  Also, the amounts advanced to assure compliance with laws or to protect the lien or priority of the lien. Of course, the Note must be credited with the foreclosure bid, and the resulting deficiency of $198,350.19 is the amount of the Indebtedness as of February 10, 2016, the sale date.

GFL asserts it is entitled to $491,494.33 as of December 3, 2018.[5]   *See* Ex. 2 to Claimant's Request to Amend Initial Claim Per Code.   The categories of sums claimed and owing to GFL are within the definition of "Indebtedness" as defined in the Title Policy, and no objection has been made thereto.

The Amount of Insurance is the face amount of the Title Policy, $220,700.00, which is the upper limit of Westcor's liability except for interest, costs and attorney's fees to the extent allowed by law.[6]   C.R.S. § 5-12-102 provides for interest at the rate of eight percent per annum, compounded annually, in the absence of an agreement, accruing from the date of wrongful withholding until paid.[7]

**Compensatory Damages Award to GFL.**   The foreclosure sale of February 10, 2016 is an appropriate measure of GFL's loss, being the date and method by which GFL's loss was liquidated, and is an appropriate date for commencement of accrual of statutory interest on the

---

[5]

| Cummulative Through 12/3/2018 (Projection Through Expected Arbitration Ruling Date)[3] | |
| --- | --- |
| $ 55,972.18 | Beyond Original Maturity Date Fees,  Late Fees, Foreclosure Charages & Other Charges[4] |
| $ 370,239.44 | Interest (Unpaid Fees become subject to interest if not paid) |
| $ 65,057.50 | Unused Rehab Funds Applied As Payment on 8/13/2015[1] |
| $ 90,439.79 | Borrower And Foreclosure Payments (Foreclosure proceeds of $87,000) |
| $ 491,414.33 | Total Outstanding Owed |

[6] "An insured's recovery under the title insurance policy may not be in an amount greater than the policy limits." Nielsen, § 3.5 Payment of Policy Limits, 2016 WL 6637038.

[7] GFL contends that Form 100 alters the loss calculation formula because it does not refer to any effect on title or diminution in value, but rather, states that the measure of loss is the loss suffered by the owner of the insured debt, not the reduction in the collateral value of the Property.  Reading Form 100 in its entirety with respect to the total liability of Westcor, it says, "The total liability of the Company under said Policy and any endorsements therein shall not exceed, in the aggregate, the face amount of the Policy and the costs which the company is obligated under the conditions and stipulations thereof to pay."  It then states that the Form 100 is an endorsement to the Policy "and is subject to the schedules, conditions and stipulations therein except as modified by the provisions hereof."  It also states that it does not increase the Amount of Insurance.  The Conditions and Stipulations section of the Title Policy does not admit the interpretation suggested by GFL.  *See* Title Policy, GFL Ex. 1A at § 14(d).  Consequently, the provisions of Form 100 do not increase the amount of insurance under the Policy or the measure of relief to which GFL is entitled, but does expand the field of Westcor's responsibility for a broader set of Covered Risks.

deficiency amount of $198,350.19 (GFL Ex. 10K) and the Brinkman survey cost of $1,820.25,

totaling $200,170.44, as the principal which are hereby awarded as compensatory damages to

GFL for its First Claim for Relief arising from Westcor's breach of the Title Policy contract and

failure to pay the covered risk and breach of the implied contractual covenant of good faith and

fair dealing.  In addition to that sum will be the statutory interest of C.R.S. § 5-12-102 from

February 10, 2016 until paid together with costs and attorney's fees to the extent allowed herein

as discussed below.

      **Attorney's Fees.**  The next step is to determine the attorney's fees that may be awarded

by reason of this arbitration.  GFL posits its entitlement to an award of attorney's fees and costs

on C.R.S. § 13-17-102 (lack of substantial justification by Westcor in maintaining defenses to

GFL's claims and insisting upon this arbitration) and the alleged wrongful denial of the existence

of encroachments and the lack of investigation and prompt resolution of the claims of GFL

evidenced obdurate behavior.   Further, GFL relies on the common law doctrine that it is

inequitable to leave the insured uncompensated for the cost of attorney's fees, which should have

been unnecessary had the insurance company properly done its job.   Additionally, GFL claims

that attorney's fees could be awarded as consequential or special damages in having to sue the

carrier to enforce the Policy.  The fiduciary breach theory asserted by GFL by which GFL asserts

a right to fees does not survive by reason of the Economic Loss Rule described above and,

finally, GFL claims that the Closing Instructions provide for an award of damages by reason of

breach of the Closing Instructions.  There was no breach of the Closing Instructions, so that is

inapplicable, and its other theories do no support an award of attorney's fees under Colorado

law, other than under C.R.S. § 13-17-102.

The Federal Arbitration Act, 9 USCA §§ 1, *et seq.* ("FAA")*,* is applicable because the parties did not agree otherwise and the Title Policy does have a connection with interstate commerce.  It permits but does not mandate an award of attorney's fees unless provided by state law.  This is not the case at bar.  Also the Colorado Uniform Arbitration Act, C.R.S. §§ 13-22-101, *et seq.,* and Colorado law generally, controls to the extent not in conflict with the FAA.[8] *See* Title Policy, GFL Ex. 1A at § 16.  Further, the parties have stipulated that they do not, by their submissions, agree that attorney's fees may be awarded beyond those authorized by C.R.S. § 13-17-102, which each of them has claimed, and is awardable in a civil action under Colorado law pursuant to C.R.S. § 13-22-221(1).

Both Westcor and GFL have argued the effect of CRS § 13-17-102(4) and that the test for the assertion of claims and defenses could give rise to an award of attorney's fees based upon the lack of substantial justification as to fact or law.  Westcor argues that it acted reasonably, with rational arguments, and did not maintain a vexatious defense or claim brought in bad faith.

Westcor was entitled to defend GFL's claim to the fullest extent of fact and law, including its Motion to Dismiss under the Economic Loss Rule, and that the Alessi ILC did not put Unified Title or Westcor on notice of the encroachment/access problem.  Westcor has not advanced claims or defenses which lack substantial justification.

Conversely, GFL has advanced theories of liability and bases for an award of attorney's fees which are not sustainable in law or fact; they lack substantial justification, to wit:  the lack

---

[8] *Preston v. Ferrer*, 552 U.S. 346, 353, 128 S. Ct. 978, 169 L.Ed.2d 917 (2008), state law is preempted only "to the extent that it actually conflicts with federal law" and "would undermine the goals and policies of the FAA," *Volt Info. Sciens., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 477-78, 109 S. Ct. 1248, 103 L.Ed.2d 488 (1989).  "We have previously recognized that the FAA and the NMUAA may apply to the same arbitration agreement so long as the NMUAA doesn't conflict with the FAA.3"  *See THI of N.M. at Hobbs Ctr., LLC v. Patton*, 741 F.3d 1162, 1169-70 (10th Cir. 2014).  The Arbitration Agreement poses no such conflict.  *THI of New Mexico at Vida Encantada, LLC v. Lovato*, 864 F.3d 1080, 1087 (10th Cir. 2017).

of legal and factual foundation for the claim of Bad Faith Breach of the Contract (Second Claim for Relief) under common law tort theory which is invalidated by the Economic Loss Rule and the lack of credible evidence;  the lack of credible evidence for GFL's claim of Breach of Contract – Closing Instructions (Third Claim for Relief) where there was no evidence of breach and GFL bore the risk of ambiguity in the Closing Instructions; Breach of Fiduciary Duty (Fourth Claim for Relief) also precluded by the Economic Loss Rule; and Exemplary Damages (Fifth Claim for Relief) which fails for lack of credible evidence demonstrating willful, wanton activity or reckless disregard for GFL's rights.  These contentions, not sustainable under fact or law, precipitated and continued obdurate litigation and violated the principles of C.R.S. § 13-17-102.  GFL's Fourth Claim for Relief (Breach of Fiduciary Duty) as well as its Second Claim for Relief relating to non-statutory breach of contract, have both failed by reason of the Economic Loss Rule.  Additionally, GFL made no effort to narrow the issues by withdrawing claims for which it had neither a legal basis nor any credible evidence.

Therefore, an award of attorney's fees is warranted in favor of Westcor against GFL in the amount of $48,726.00, the fees incurred by Westcor in responding to and defending GFL's claims which lacked substantial justification, all as permitted by C.R.S. § 13-22-221(1) and Rule 5.1(D) of the Forum Rules.  These attorney's fees are enforceable by any means, including judgment on this Award or an offset against awards to GFL herein.  This is the only basis for an award of attorney's fees in this action.[9]  Except as provided herein, each party must bear its own attorney's fees.

---

[9] The American Rule, followed by Colorado, requires the presence of an express statute, rule of court or a private contract in order to authorize an award of attorney's fees to the prevailing party in a civil action.  *See Bernhard v. Farmers Insurance Exchange Ins.*, 915 P.2d 1285 (Colorado 1996) (Rejecting the notion that an insured may recover attorney's fees as economic loss caused by the tort inflicted by its insurer and rejecting *Farmers Group Inc.*

**Costs.** The parties have both asserted the applicability of C.R.C.P. 54(d) as authorizing an award of costs in a civil action as extended to arbitration proceedings pursuant to C.R.S. § 13-22-221(1). Costs are, therefore, awarded. This is an action containing multiple claims and defenses and, despite that the fact that GFL receives an award of damages hereunder, the Arbitrator must engage in evaluating the relative strengths and weaknesses of each party's claims and the significance of that success in the context of the overall litigation. Both parties and their respective counsel put a great deal of energy and thought into evidentiary presentation, briefing, legal research, and the myriad of tasks relating to complex litigation. "When a case involves multiple claims, some of which are successful and some of which are not, a trial court has sole discretion to determine who is a 'prevailing party,' even if the claims are filed by only one party." *Archer v. Farmer Bros. Co.*, 90 P.3d 228, 231 (Colo. 2004).

GFL prevailed on its breach of contract claim, which includes breach of the covenant of good faith and fair dealing. It did not prevail on bad faith breach of contract, breach of contract involving the Closing Instructions, breach of fiduciary duty, or exemplary damages. Conversely, Westcor prevailed in obtaining dismissal of the bad faith breach of contract claim, the Closing

---

*v. Trimble*, 768 P.2d 1243 (Colo. Appeals 1988)). The Title Policy, the insurance contract, does not provide a basis for an award of attorney's fees and the statutory tort of bad faith is rendered inapplicable by its own terms with respect to title insurance companies, thus eliminating a statutory basis for an award of fees. *See* C.R.S. § 10-3-1115(6). *See also Stewart Title Guaranty Co. v. Tilden*, 181 P.3d 94, 99 at n. 2 (Wy. 2008) (attorney's fees cannot be obtained where those fees are based upon equitable policies rather than the insurance contract). *See Guaranty Trust Life v. Estate of Casper*, 418 P.3d 1163, 1172 (Colo. 2018) (attorney's fees not actual damages in the absence of contractual or statutory mandates to the contrary because they are not "the legitimate consequences of the tort or breach of contact sued upon and thus not recoverable"). Therefore, it is perhaps the only reason that CRS § 10-3-1116(1) authorizes attorney's fees for a bad faith case brought under that statute. That is not the case we have at bar, which asserts a common law bad faith tort, again frustrated by the economic loss doctrine.

Therefore, Colorado law precludes an award of attorney's fees in this instance. The center of gravity of this action is in Colorado and although the Arbitrator is free to look to other jurisdictions or apply law that may be somewhat different from Colorado's own position, to do so would be improper. Since the property is in Colorado, Colorado law should apply, and wandering through an archipelago of other jurisdictions to reach certain results renders the process open to question. The Forum Rule and the choice of law provisions of the Title Policy recognize this. Consequently, only attorney's fees awardable under C.R.S. §13-17-102 may be considered.

36

Instructions claim for breach of contract, the breach of fiduciary claim, and the exemplary damages claim.  Westcor, for purposes of allocation of costs, is the "prevailing party" and is awarded $21,403.38 against GFL for a portion of Westcor's costs.  GFL must bear its own costs.

**Arbitration Fees.**  The fees and costs of the arbitral facility and the Arbitrator shall be borne equally by the parties and paid in full within thirty days.

**Final Award.**  This is a final Award subject to modification only to the extent provided by the Business to Business Code of the Forum and its Rules governing this proceeding.

DATED:  December 20, 2018.

**BY THE ARBITRATOR:**

By:_____
    Thomas M. Haskins III (#17651)
    S&D Law
    1290 N. Broadway, Ste. 1650
    Denver, CO 80203
    Office:  303.399.3000
    Cell:  719.440.1800
    Email:  haskinst@s-d.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2018, a true and correct copy of the foregoing **FINAL AWARD OF THE ARBITRATOR** was served via electronic mail upon the following:

Kirk B. Holleyman
KIRK HOLLEYMAN, P.C.
730 17th St., Ste. 340
Denver, CO 80202
Telephone:  303.436.1699
KirkHolleyman@aol.com
*Attorney for GFL Good Funds Lending, LLC*

Amy K. Hunt, #37160
Edward P. Timmins, #11719
TIMMINS LLC
450 E. 17th Ave., Ste. 210
Denver, CO 80203
Telephone:  303.592.4500
ah@timminslaw.com; et@timminslaw.com
*Attorneys for Respondent Westcor Land Title Insurance Company*

Carmen P.
Case Coordinator
FORUM
P.O. Box 50191
Minneapolis, Minnesota 55405-0191
carmenp@adrforum.com

*/s/ Rebecca Gibson*

H896466

38

**Exhibit B**

## FORUM ARBITRATION DISPUTE RESOLUTION

### File No. FA1706001737926

**CLAIMANT:**      GOOD FUNDS LENDING, LLC, a Colorado limited liability company,

**v.**

**RESPONDENT:**   WESTCOR LAND TITLE INSURANCE COMPANY,
                 a California corporation.

---

### ARBITRATOR'S ORDER RE: CLAIMANT'S REQUEST AND MOTION FOR MODIFICATION TO CLARIFY INTEREST RATE ON COMPENSATORY DAMAGES AWARD TO CLAIMANT PURSUANT TO C.R.S. SECTION 13-22-220(1)(C)

---

Upon consideration of the Claimant's Request and Motion for Modification to Clarify Interest Rate on Compensatory Damages ("Motion") and the Respondent's Response thereto, and being fully advised in the premises, the Arbitrator hereby

FINDS:

A.      The Motion assumes that the mere acknowledgment in the Award that Claimant's calculation as to amounts due under the "Indebtedness" contains the same categories as described in the Title Policy is an adoption that of the interest rate of the Note by the Arbitrator. It is not.  The default rate of interest provided in the Note was specifically not utilized as a measure of damages and was clearly rejected by the Arbitrator in the Award.  The amount of $200,170.44 was awarded as principal together with statutory interest under C.R.S. § 5-12-102. Had the Arbitrator intended to utilize the twenty-five percent default interest rate propounded by Claimant, he would have done so.  Moreover, the damages award is based, in large part, upon the Amount of Insurance, not the Amount of the Indebtedness or the terms of the secured Note.

B.     No interest rate is provided in the Title Policy for amounts or damages based upon the Amount of Insurance.

C.     Westcor did not assume the obligations of the Note or Indebtedness held by Claimant.  Westcor wrongfully withheld and delayed payment of the claim for which interest was awarded for the wrongful detention of money for which no interest rate is specified in the Title Policy.

D.     There is no ambiguity in the Award with respect to the rate of interest.

E.     Claimant's attempt to characterize the Motion as a mere "clarification" in order to fall within the amendatory principles of the Colorado Uniform Arbitration Act is disingenuous and lacks substantial justification.  The true purpose of the Motion was to substantially increase the amount recoverable by Claimant as an unwarranted substantive modification of the Award.  There is no clerical or other mechanical or administrative error in the Award justifying the Motion under C.R.S. § 13-22-220(1)(c) in that no need for "correction" or "clarification" was demonstrated.  The Motion lacks substantial justification within the meaning of C.R.S. § 13-17-102.  For these reasons it is, hereby

ORDERED:

1.     The Motion is DENIED.

2.     Westcor is hereby awarded its attorneys' fees of $1,000.00 expended to respond to the Motion.

3.     The additional fees of the Arbitrator incurred regard to the Motion are fixed at $750.00 which shall be paid by Claimant through the FORUM.

Dated:  January 15, 2019.

BY THE ARBITRATOR:

By:_____
    Thomas M. Haskins, III (#17651)
    S&D Law
    1290 N. Broadway, Ste. 1650
    Denver, CO 80203
    Office:  303.399.3000
    Cell:  719.440.1800
    haskinst@s-d.com


## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2019, a true and correct copy of the foregoing **ARBITRATOR'S ORDER RE CLAIMANT'S REQUEST AND MOTION FOR MODIFICATION TO CLARIFY INTEREST RATE ON COMPENSATORY DAMAGES AWARD TO CLAIMANT PURSUANT TO C.R.S. SECTION 13-22-220(1)(C)** was served via electronic mail upon the following:

Kirk B. Holleyman
KIRK HOLLEYMAN, P.C.
730 17th St., Ste. 340
Denver, CO 80202
Telephone:  303.436.1699
KirkHolleyman@aol.com
*Attorney for Claimant Good Funds Lending, LLC*

Amy K. Hunt, #37160
Edward P. Timmins, #11719
TIMMINS LLC
450 E. 17th Ave., Ste. 210
Denver, CO 80203
Telephone:  303.592.4500
ah@timminslaw.com; et@timminslaw.com
*Attorneys for Respondent Westcor Land Title Insurance Company*

Carmen P.
Case Coordinator
FORUM
P.O. Box 50191
Minneapolis, Minnesota 55405-0191
carmenp@adrforum.com

    */s/ Rebecca Gibson*

HA7524

3